

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-12-00120-CR

DON MARTIN O'NEAL, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 8th District Court
Hopkins County, Texas
Trial Court No. 1021873

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Moseley

# OPINION

Don Martin O'Neal entered his plea of guilty to the first degree felony offense of misapplication of fiduciary property in excess of $200,000.00[1] and was placed on ten years' deferred adjudication community supervision. One of the conditions of his community supervision was a requirement that O'Neal make restitution, and a hearing was conducted to determine the amount of that restitution. Upon hearing the evidence, the trial court ordered O'Neal to pay restitution in the amount of $817,674.84 to the victim, Sulphur Springs Medical-Surgical Clinic. O'Neal appeals the restitution order, claiming that the amount of restitution ordered to be paid by him is not factually supported by the record. We affirm the judgment of the trial court.

## I. Background

O'Neal, a physician, first became associated in 1979 with what eventually came to be a partnership named the Sulphur Springs Medical-Surgical Clinic (the Clinic),[2] becoming its managing partner during the 1990s. As managing partner, he made the day-to-day financial decisions involved in the business operations of the Clinic and those associated with the Clinic

---

[1] TEX. PENAL CODE ANN. § 32.45(c)(7) (West 2011).

[2] Over the years, the Clinic underwent various name changes. The Clinic was also known, at various points in time, as Sulphur Springs Medical-Surgical Clinic and Family Healthcare Associates. In 2003, the Clinic was called the Sulphur Springs Medical-Surgical Clinic, P.A., a partnership of four physicians, including O'Neal, Curtis Cutrell, I.L. Balkcom, and Charles Jones. Each physician partner owned twenty-five percent of the partnership.

came to rely on O'Neal, as its managing partner, to make decisions concerning the operations of the enterprise and the management of the partnership assets.[3]

In 2003, O'Neal started a separate business entity with Gary Stokes which they named North Campus Development, Ltd. (North Campus). Among its activities, North Campus purchased medical equipment which it leased to the Clinic and acted as a recruiter of specialty physicians for the Clinic. Stokes' responsibility included the task of working with North Campus and Hopkins County Memorial Hospital (the Hospital) in the task of recruiting physicians.

In 2004, North Campus recruited Scott Powell, M.D., to practice both at the Clinic and at the Hospital. Powell's employment involved the execution of a convoluted series of contracts,[4] requiring the Hospital to pay Powell a guarantee of $26,500.00 per month for the first twelve months of his practice, plus his Clinic expenses as submitted by the Clinic to the Hospital. Powell's agreement with North Campus evidently required him to pay North Campus his entire Hospital income guarantee of $26,500.00 per month, plus expenses, less Powell's Clinic billing for that month.[5] The Clinic paid Powell a salary of $16,500.00 per month. For the first five months of his employment, Powell paid North Campus accordingly. North Campus took the sums collected from Powell over those five months, divided the total by twelve, and then paid

---

[3]O'Neal was removed as managing partner in October 2009. The record does not reflect the date on which, if ever, such partnership was formally or informally dissolved.

[4]Powell, the Clinic, and the Hospital entered into a three-way contract. Powell also contracted with the Clinic and with North Campus.

[5]Powell also evidently agreed to pay North Campus for its services in negotiating his contracts with the Hospital and the Clinic.

the Clinic all of these sums received in the five-month period, spreading it out over twelve months.[6] In months six through twelve, Powell ceased making payments to North Campus; instead, he paid by checks made payable to the Clinic.[7] These payments were made in a series of thirteen checks in varying amounts, totaling $370,516.70. Despite the fact that each of these checks from Powell were made payable to the Clinic, O'Neal deposited each of them into his personal account and not to the account of the Clinic.

In 2005, the Clinic purchased an echocardiogram machine from North Campus.[8] Deborah Stokes, M.D., had a contract with the Hospital to operate the machine and was paid by the Hospital for those services. Dr. Stokes would then reimburse the Clinic for the amount the Hospital paid for the use of the machine. From 2004[9] through 2007, Dr. Stokes wrote a total of twenty-six checks (each payable to the Clinic), totaling $416,966.62. Even though these checks were made payable to the Clinic, O'Neal admits that he deposited each of them into his personal account.

---

[6]North Campus paid the Clinic all of the monies it received from Powell, totaling $207,000.00. Powell's payments to North Campus were made pursuant to an alleged agreement dated February 5, 2003, between North Campus and the Clinic, whereby the Clinic retained the services of North Campus to recruit multi-specialty physicians. The agreement provided that North Campus would be entitled to the physician guarantee. It also required the Clinic to pay North Campus a "20% fee." The Clinic was not required to pay any physician recruitment costs. Presumably, the payments by North Campus to the Clinic were reimbursement of recruitment costs. The agreement was handwritten by O'Neal and signed only by O'Neal on behalf of the Clinic. Although O'Neal was one of the two North Campus partners, the agreement was not signed by another representative of North Campus.

[7]There is no explanation in the record for this change.

[8]The echocardiogram machine was originally owned by Deborah and Gary Stokes, who leased the machine to the Clinic in 2003.

[9]These payments began during the time when the Clinic was leasing the echocardiogram machine from the Stokeses.

4

Michael Hines, M.D., was a Sulphur Springs surgeon who became employed by the Clinic in the very early part of 2005, but left the Clinic in October 2005 to begin work at East Texas Medical Center in the same city. After leaving the Clinic, Hines wrote a series of four checks to the Clinic, totaling $20,558.76, to reimburse the Clinic for expenses incurred on Hines' behalf. O'Neal admits that despite the fact that the checks were made payable to the Clinic, he endorsed them and deposited each of them into his personal bank account.

In 2004 and 2005, Thomas A. Mitchell, M.D., came to the Clinic one day a week to conduct neurologic testing, electromyography tests (EMG) and nerve conduction studies for Clinic patients. Mitchell paid a total of $9,632.76 in lease payments to the Clinic for use of its premises. These payments were made in a series of six checks, all payable to the Clinic. O'Neal admits that he deposited each of these six checks into his personal bank account rather than into the Clinic's account.

The trial court ordered O'Neal to pay the Clinic restitution in the total amount of the checks he admitted that he had deposited into his personal bank account: $817,674.84.

II. Analysis

On appeal, O'Neal claims the trial court abused its discretion in ordering restitution in the amount of $817,674.84 because this amount is not factually supported in the record. We review challenges to restitution orders under an abuse of discretion standard. *Cantrell v. State*, 75 S.W.3d 503, 512 (Tex. App.—Texarkana 2002, pet. ref'd) (citing *Cartwright v. State*, 605 S.W.2d 287, 288–89 (Tex. Crim. App. [Panel Op.] 1980)). A trial court abuses its discretion when it acts without reference to any guiding rules or principles or acts arbitrarily or

5

unreasonably, or when its decision is so clearly wrong that it lies outside the zone of reasonable disagreement. *Gonzalez v. State*, 117 S.W.3d 831, 839 (Tex. Crim. App. 2003).

A sentencing court may order a defendant to pay restitution to the victim of an offense. TEX. CODE CRIM. PROC. ANN. art. 42.037(a) (West Supp. 2012); *Idowu v. State*, 73 S.W.3d 918, 920 n.5 (Tex. Crim. App. 2002).[10] The State must prove, by a preponderance of the evidence, the amount of loss sustained by the victim as a result of the offense. TEX. CODE CRIM. PROC. ANN. art. 42.037(k) (West Supp. 2012). The trial court must resolve any dispute relating to the proper amount or type of restitution. *Id.* However, the amount of restitution ordered (1) must be just and supported by a factual basis within the loss of the victim, (2) must be for the offense for which the defendant is criminally responsible, and (3) must be for the victim of the offense for which the defendant is charged. *See Campbell v. State*, 5 S.W.3d 693, 696–97 (Tex. Crim. App. 1999); *Cantrell*, 75 S.W.3d at 512.

Here, O'Neal only contends that the restitution awarded is not just and is not supported by a factual basis within the loss of the victim of the offense. He claims the State did not prove by a preponderance of the evidence that restitution is owed to "the other three partners in the [C]linic" in the amount ordered. O'Neal's argument falls into two categories: (1) some, if not all, of the funds he misapplied were owed to North Campus for its recruitment efforts, among other things, on the Clinic's behalf, and (2) because O'Neal was a twenty-five percent partner in

---

[10]Under Article 42.12 of the Texas Code of Criminal Procedure, a trial court may impose any reasonable conditions of community supervision, including restitution to the victim, when it grants deferred adjudication. *See* TEX. CODE CRIM. PROC. ANN. art. 42.12, §§ 5(a), 11(b) (West Supp. 2012).

the Clinic, he was entitled to twenty-five percent of the restitution award. Because of these two factors, he alleges that the restitution award was excessive.

In support of his claim that the amount of restitution ordered is not factually supported by the record, O'Neal relies on *Montgomery v. State*, 83 S.W.3d 909 (Tex. App.—Eastland 2002, no pet.). In that case, Montgomery obtained two loans from a bank. The bank obtained security interests in eight vehicles to secure the loans. Montgomery did not pay the loans and was ultimately convicted of hindering the bank in the enforcement of its security interests in the vehicles. *Id*. at 911. The value of the secured property was approximately $49,300.00. *Id*. Montgomery was ordered to pay restitution in the total amount of $196,516.18. Of this amount, Montgomery was ordered to pay the bank $97,144.07 (the amount Montgomery owed the bank on the two loans related to the offenses in question and a third, unrelated loan). *Id*. at 912. Montgomery was ordered to pay the remainder of the restitution to a second bank for amounts allegedly due on a loan with that bank.

In finding the trial court's restitution orders excessive, the court determined that instead of considering the value of the secured property, the trial court erroneously awarded the bank the entire amounts Montgomery allegedly owed to the bank on the two loans. In addition, the trial court erred in awarding restitution in connection with the third loan, a loan which was not related to the offense in question. Finally, the trial court erred in awarding restitution to the second bank because it was not a victim of the subject offense. *Id*. at 912–13. In so holding, the court noted that "the amount of a restitution order is limited to only the losses or expenses that the victim or victims proved they suffered as a result of the offense for which the defendant was convicted."

7

*Id.* at 912. Unlike *Montgomery*, restitution in this case was related to the offense in question and was limited to the loss of the victim. Moreover, this case does not involve the issue of whether restitution is properly based on the value of secured property versus the amount of a secured loan.

O'Neal also relies on *Drilling v. State*, 134 S.W.3d 468 (Tex. App.—Waco 2004, no pet.) (per curiam). In that case, the trial court ordered Drilling to pay nearly $180,000.00 in restitution to the victim in an arson case in which some of the property in question either belonged to Drilling or was undamaged by his criminal act. *Id.* at 470–71. The victim testified that many items listed on the inventory of personal belongings in her home were not destroyed in the fire. There was also evidence that several of the items listed on the inventory were Drilling's personal property. *Id.* at 470.

O'Neal maintains that as in *Montgomery* and *Drilling*, the trial court ordered restitution without taking into account what amounts the Clinic owed O'Neal as a part owner of the entity. He maintains that the trial court simply based its order on the testimony of O'Neal's former partner, Cutrell, and assumed that the Clinic owed nothing to O'Neal. On the contrary, the trial court heard extensive testimony from O'Neal, including his contentions that the Clinic owed all of the misappropriated money to him. The State had the burden to prove, by a preponderance of the evidence, the proper amount of restitution owed. In determining that the State carried this burden, the trial court was permitted to judge the credibility of the witnesses and resolve any factual disputes regarding the appropriate amount of restitution. TEX. CODE CRIM. PROC. ANN. art. 42.037(k).

O'Neal advances various theories to explain why he was personally entitled to the misappropriated funds. The discussion must be broken down into different parts because a different rationale is supplied by O'Neal for different fact circumstances in attempting to support his contentions.

## A.     The Powell Checks

O'Neal maintained that he deposited the Powell checks made payable to the Clinic into his personal account because these were monies owed to North Campus under the contract to expand the Clinic into a multi-specialty facility.[11] Stated differently, these funds were allegedly used to pay off a debt owed by the Clinic to North Campus, consisting of the recruitment money paid to Powell. O'Neal testified that the recruitment fee, which he described as Powell's guaranteed monthly salary of $26,500.00 from the Hospital, was owed to North Campus in accord with its management services contract with the Clinic.[12] O'Neal testified that he believed that the Powell checks were his personal money because he was, in essence, the alter ego of North Campus, and, as such, was entitled to the money. O'Neal admitted, however, that North Campus paid none of the Powell recruiting fees, all of those fees being paid for by the Hospital.

O'Neal relies on two different documents in support of his claims. The first is the multi-specialty agreement, which reads:

> FHA hereby declares their intention to become a multi-specialty Clinic and contracts with North Campus Development, LTD to recruit physicians of various specialties including GI, General Surgery, Orthopedics and Primary Care to fulfill that goal. FHA desires North Campus Development to develop a relationship

---

[11]Powell did not testify at the restitution hearing.

[12]As explained below, the multi-specialty agreement and the management services contract are separate documents.

with HCMH, ETMC, Prebsy or Baylor[13] to be the financial partner so it results in a close to net zero cost to FHA. FHA requires these new physicians to be their employees. FHA will receive all revenues from the services of the newly recruited physicians.

Compensation: North Campus Development shall be entitled to the physician guarantee, reimbursed recruitment fees and any Management Services Agreement fees not current and paid by, to, or from the financial partner, FHA, MSA, or the physician.

North Campus Development is authorized to negotiate, endorse over, and settle monies owed between our financial partner[,] FHA, MSA, or the physician as long as the monies owed do not exceed contracted fees for each of these entities.

FHA desires NCD to develop appropriate physical facilities to accommodate the newly recruited specialty and primary care physicians. FHA will pay NCD a 20% fee.

> Family Healthcare Assoc
> Don O'Neal M.D.

This document is dated February 5, 2003; it is signed only by O'Neal for Family Healthcare Associates (the Clinic). The compensation terms of Powell's contract with the Clinic are not included in the record. Powell's checks to the Clinic included the physician guarantee by the Hospital of $26,500.00 per month, plus Clinic expenses, less Powell's billing for that month.

Clinic expenses incurred by Powell or on his behalf were determined by O'Neal. The greater the amount of expenses submitted, the more money Powell owed North Campus each month. Whatever revenue Powell brought into the Clinic was subtracted from the expenses. The Hospital, under the three-way contract, was required to pay the balance to Powell.

The revenue Powell earned at the Clinic was determined by the amount he collected each month. O'Neal, however, received all of Powell's billings during that time. Cutrell testified that

---

[13]By way of explanation, it appears that the abbreviations were as follows: HCMH, ETMC, Prebsy, and Baylor were each references to Hospitals, FHA was a reference to the Clinic, and NCD was a reference to North Campus.

10

O'Neal "doctored" Powell's revenue billing. "[I]n an effort to make the payments larger, he held onto the charges and did not submit them so that that money could not be collected." As a result, "the amount of money the [H]ospital paid Powell was more, and . . . the amount of money that Powell wrote to the [C]linic that he misapplied would be more." When the physician guarantee provisions of the contract expired after twelve months, the revenue attributed to Powell, as submitted by O'Neal, "jumped tremendously."[14]

O'Neal also relies on the management services agreement between the Clinic and North Campus in support of his contention that he was entitled to the Powell checks. This document generally empowers North Campus to manage the business of the Clinic. The contract is dated January 1, 2003, and provides for a management fee of twenty-seven percent of the gross collected. O'Neal alleges the terms of this contract apply to the Powell checks because North Campus managed Powell's practice.[15] At the time this contract was allegedly created, North Campus was not yet in existence.

The existence of this agreement was apparently unknown to O'Neal's partners for quite some time. O'Neal testified that Balkcom saw the management services agreement at some point, but as far as he knew, Jones never saw it.[16] Cutrell testified that he did not see the agreement until March 2010—this being about the time civil litigation commenced—some seven

---

[14]Powell's Clinic revenue for August 2005 was $212,000.00, whereas prior to the expiration of the physician guarantee provision, his revenue was as low as $7,000.00, and no more than $45,000.00.

[15]This contract, unlike the alleged agreement dated February 3, 2003, is typewritten and is signed by O'Neal as the authorized representative of Family Healthcare Associates and by Gary Stokes as manager of North Campus.

[16]Balkcom and Jones did not testify at the restitution hearing.

11

years after it had allegedly been executed.[17]  Cutrell further testified that in late 2007 or early 2008, Balkcom was involved in a "rather heated" discussion with Stokes regarding "all the money that was flying out of the [C]linic."  At that point, Stokes "ran down the hall" and came back with a contract dated January 1, 2003.  O'Neal testified that his partners knew about the management services agreement because they had a partnership meeting specifically dealing with it.  Although O'Neal maintained that notes of this meeting were taken, those notes cannot be located.

O'Neal further claims that the Powell checks were owed to him as repayment of loans he made to the Clinic when the Clinic did not have sufficient funds to make payroll.  O'Neal did not, however, testify as to the specific amount of funds allegedly owed to him by the Clinic, or whether those funds were ever repaid.

Cutrell testified that O'Neal has been dishonest in the past.  In the latter part of 2006, O'Neal wanted the Clinic to purchase a magnetic resonance imager (MRI) machine, a purchase the Clinic declined to make.  Cutrell later learned that O'Neal and his son, Scott, purchased an MRI machine for $575,000.00 from Barrington Medical Imaging, LLC.  Even though the machine's cost was $575,000.00, O'Neal received a bank loan in the amount of $1.165 million with the explanation to the bank that the loan was secured in order to make this purchase.  O'Neal deposited the extra loan funds into his personal bank account and used it to purchase land.

---

[17]Cutrell testified that he does not believe the management services agreement was actually created in 2003.

O'Neal could not repay the loan if the Clinic was not using the MRI machine. He, therefore, presented the partnership with a purported agreement from Barrington to lease the MRI machine to the Clinic, which O'Neal signed on behalf of the Clinic. Unbeknownst to his partners, the lease was bogus. Clinic lease payments corresponded to O'Neal's monthly loan payment. O'Neal then used the lease payments to pay his loan on the MRI machine. The lease was discovered to be a fake when Balkcom called Barrington about the lease agreement. Barrington informed Balkcom that they did not lease equipment, but had sold the MRI machine to O'Neal. When his partners confronted O'Neal about the lease, O'Neal admitted that he created the lease himself and that it was not from Barrington.

O'Neal further testified that as managing partner of the Clinic, he had the power to enter into contracts on behalf of the Clinic without the knowledge or consent of his partners. In 2005, as managing partner, O'Neal increased his own pay without the approval of his partners. O'Neal admitted that even though a pay increase should be approved by the others in the partnership, he simply increased his salary because he had that power.

It was the trial court's role, as the fact-finder in this case, to resolve any dispute relating to the proper amount of restitution. TEX. CODE CRIM. PROC. ANN. art. 42.037(k); *Thomas v. State*, 379 S.W.3d 436, 438 (Tex. App.—Amarillo 2012, no pet.). After having judged the credibility of the witnesses, the trial court did exactly that. The trial court also no doubt considered the uncontested evidence that if the Powell funds were owed to a person or entity other than the Clinic, that entity would have been North Campus. O'Neal was merely a partner in North Campus; he was not its sole owner.

13

## B.     The Stokes Checks

Dr. Stokes joined the Clinic in 2004.  In August 2003, before Stokes joined the Clinic, the Clinic began leasing an electrocardiograph (EKG) machine owned by Dr. Stokes and her husband, Gary, for a monthly lease payment of approximately $8,900.00.  In April 2005, the Clinic purchased the EKG machine from North Campus for $690,000.00.[18]  The machine was listed on the tax rolls as having an actual value of $47,000.00.

The Hospital was paying Dr. Stokes for the usage of the EKG at the time of the Clinic purchase in 2005.  Stokes would then pay the Clinic for that usage.  The Clinic did not begin receiving these payments, however, until October 2007.  For almost three years, O'Neal deposited Dr. Stokes' checks payable to the Clinic into his personal account.  O'Neal admits that his partners did not know that money "was coming and going" involving Dr. Stokes because "That's the way it was set up."

O'Neal testified that the Stokes' checks were actually hand delivered to him by Gary (who wrote the checks to the Clinic on behalf of Dr. Stokes).[19]  O'Neal admitted that he had deposited these checks into his personal account rather than the Clinic account, claiming that the funds were owed to North Campus pursuant to the management services agreement.  O'Neal stated that since the Stokes checks were credited by him to the debt due by the Clinic to North Campus, the Clinic has received the benefit of those funds.  He further testified that these monies

---

[18]North Campus was created in October 2003.  O'Neal testified that he joined North Campus a few weeks after it was created.  O'Neal "bought into" the Stokeses' EKG machine for $250,000.00, representing his North Campus "buy in" cost as well.  This was the same EKG that was later sold to the Clinic in 2005.  In November 2003, the Stokeses assigned fifty percent of the management services contract to O'Neal.

[19]Neither Gary nor Dr. Stokes testified at the restitution hearing.

14

were credited to the Clinic's debt to North Campus under the multi-specialty recruitment agreement. Finally, O'Neal testified that he "kept track of all the money that was owed under these contracts and all the money that was coming in and all the money that was going out." Rather inexplicably for ratification of these claims, O'Neal did not bring this accounting to the hearing, but testified that it is maintained on his computer. He has never produced an actual accounting which credited the checks he deposited into his personal account to the debt he believed was owed to North Campus. Thus, there was no evidence of the specific amount of money O'Neal claims the Clinic owed him, either individually or to the entity of which he was an owner, North Campus.

Although O'Neal testified that he was entitled to the Stokes checks, and those funds were credited against Clinic debt to North Campus, restitution to include the Stokes checks is factually supported by the record. The trial court was in the position to judge the credibility of the witnesses and to determine any dispute as to the proper amount of restitution. We find no abuse of discretion with respect to the determination that the full amount of the Stokes checks were subject to restitution.

### C. The Hines Checks

Hines was a surgeon who joined the Clinic in the early part of 2005, but left the Clinic in October 2005 to commence employment at East Texas Medical Center. After Hines left the Clinic, he reimbursed the Clinic for expenses incurred on his behalf while employed there. These checks, totaling $20,558.76, were made payable to the Clinic but were deposited by O'Neal into his own personal bank account. The explanation proffered by O'Neal was that

15

North Campus recruited Hines to the Clinic and, therefore, the fees were due to North Campus and not to the Clinic. O'Neal maintained that the checks Hines delivered should have been made payable to North Campus because they were payment for North Campus' recruitment fee. Because Hines already lived in Sulphur Springs at the time he was recruited, North Campus neither earned any fees nor expended any funds in order to recruit Hines. According to O'Neal, Hines' checks were actually in payment of a North Campus set-up and management fee, all in accord with Hines' agreement with North Campus.[20] In apparent contradiction to this testimony, O'Neal testified in the earlier civil case[21] that Hines' checks to the Clinic were written in accord with Hines' agreement with the Clinic which required Hines—for an unknown period of time—to return forty percent of his salary to the Clinic.[22]

Neither these funds, nor the funds from Powell, Stokes, or Mitchell, were ever credited to the North Campus account. O'Neal amended his individual income tax return in 2010 to pay taxes on these funds. O'Neal admitted that North Campus did not owe him all of the misappropriated funds—he would have been entitled to only one-half of those sums. O'Neal did not pay North Campus one-half of the misappropriated funds, although he "wrote checks to Gary."

---

[20]The record does not include a written agreement between Hines and North Campus. Hines did not testify at the restitution hearing.

[21]O'Neal's deposition, taken in February 2012 in connection with the civil lawsuit O'Neal filed against the Clinic, among others, was admitted as State's Exhibit 1 at the restitution hearing.

[22]This agreement is not a part of the appellate record.

The trial court was charged with resolving any dispute regarding the proper amount of restitution. Its determination that the funds represented by the Hines checks were subject to restitution is factually supported by the record.

### D. The Mitchell Checks

Mitchell was a Dallas neurologist who practiced only one day a week at the Clinic. While Mitchell was recruited to the Clinic by North Campus, North Campus did not incur any recruiting fees. O'Neal testified that the Mitchell checks were in payment of set-up and management fees incurred by North Campus. In his civil deposition, O'Neal testified that the Mitchell checks were applied to the debts the Clinic owed North Campus pursuant to the physician recruitment and/or management service agreement. O'Neal testified he did not know how much of those funds were applied to each contract. O'Neal further testified that the Mitchell checks were, in part, given as reimbursement of North Campus' recruiting fee.

Cutrell testified that the Mitchell checks were reimbursement to the Clinic for leasing an area to practice and for expenses incurred by the Clinic.

The trial court was charged with resolving any dispute regarding the proper amount of restitution. Its determination that the funds represented by the Mitchell checks were subject to restitution is factually supported by the record.

### E. The Restitution Award Was Not Excessive

Aside from O'Neal's claim that the Clinic owed him some, if not all, of the funds he admittedly misappropriated, he further claims that his status as a twenty-five percent partner in the Clinic entitled him to a twenty-five percent credit in the restitution amount. Stated

differently, because he was a part owner of the Clinic, the victim in this case, O'Neal does not believe he should be required to pay the full amount of restitution ordered. One fallacy with that argument is that under Texas law, the entity theory applies to partnership income and profits. *See* TEX. BUS. ORGS. CODE ANN. §§ 152.101–.102 (West 2012). Individual partners do not own any of either the income or the profits while they remain in the partnership's hands and have not been distributed to the partners. *In re Allcat Claims Serv., L.P.*, 356 S.W.3d 455, 468 (Tex. 2011).

Further, we do not believe this issue is as clear cut as O'Neal contends, even if we were to ignore the entity theory. First, it is unclear how such funds would be divided amongst the Clinic owners. O'Neal testified that not every partner received equal compensation. Physician payments were based on a collections formula for each department from 2007 through the present. Prior to 2007, the percentages were similar, but were based on charges rather than collections. If the funds were to be divided generally along the lines of how each physician was compensated, the amount each physician would receive would necessarily differ. However, if the Clinic had extra funds not earned under the formula, fifty percent of those funds were split among the partners and the remaining fifty percent was split based on a previous twelve-month average in productivity. Moreover, if any of the misapplied funds are in fact owed to other entities, allocation of the proceeds would necessarily be affected.

The Clinic is the sole victim in this case, and, as the trial court determined, the Clinic is the sole entity entitled to restitution. Any dispute regarding the proper allocation of the

18

restitution funds amongst the Clinic's partners is most appropriately resolved in a civil proceeding.

## III.    Conclusion

O'Neal admittedly misapplied the entirety of the funds included in the restitution order and testified that he was not "asking this Court to find that [he] didn't misapply the total amount that's contained within State's Exhibit No. 2."

We conclude that the total restitution amount of $817,674.84 is factually supported by the record and is within the Clinic's loss. *See Campbell*, 5 S.W.3d at 696. We, therefore, find no abuse of discretion in the amount of restitution ordered.

We affirm the judgment of the trial court.


Bailey C. Moseley
Justice


Date Submitted:     March 12, 2013
Date Decided:      March 15, 2013

Publish

19